OPINION OF THE COURT
John S. Conable, J.
An order to show cause having been issued pursuant to Justice Vincent Doyle’s instructions and a return sworn to on December 16, 1982 having been filed by the respondents and an amended return sworn to on December 17, 1982 having been filed by the respondents herein, and the *454 matter having come on to be heard before me, and due deliberation having been had, the following decision is rendered.
The petitioners in this CPLR article 78 proceeding are all Sunni Moslems who were incarcerated at the Attica Correctional Facility in July and August of 1982. Between July 25 and August 19, 1982 they were all served with misbehavior reports for performing a ritual prayer known as the “salut” in the recreation yard. During this period, each petitioner received adjustment committee dispositions which imposed terms in keeplock for up to five days plus the loss of recreation and yard for up to 14 days.
The inmates were all locked in their cells on the day each misbehavior report was written, prior to any consideration by the adjustment committee. It is alleged that these disciplinary actions were defective on three grounds: that the respondents violated the petitioners’ rights to due process of law by confining them to their cells prior to a hearing; that by punishing the Moslems for saying their prayers in the recreation yard, the respondents violated the petitioners’ religious rights as set forth in a prior decision of this court (Matter of Abdullah v Smith, 115 Misc 2d 105); and that the total suspension of exercise privileges violated applicable regulations and constituted cruel and unusual punishment. The relief sought is an order declaring the adjustment committee hearings to be null and void and expunging all reference to these matters from institutional records.
Counsel for the petitioners contends that it was illegal to put the inmates into keeplock prior to their appearance before the adjustment committee without a showing that such confinement was necessitated by an immediate threat to security or order. Reliance is placed upon the decision of the United States Supreme Court (Hughes v Rowe, 449 US 5), which indicated that segregation prior to a hearing may violate due process of law. Although the Supreme Court has subsequently questioned whether or not the Hughes case established a substantive rule of constitutional law (see Hewitt v Helms, 459 US_, 103 S Ct 864) this court granted similar relief in the Abdullah case (supra), upon authority of Hughes (supra), and the determination by the *455 United States Court of Appeals for the Second Circuit that keeplock is a form of special confinement which may not be imposed in the absence of due process protections (see Powell v Ward, 643 F2d 924; Matter of Abdullah v Smith, 115 Misc 2d 105, 106, supra).
Since Abdullah (supra) was decided on April 28, 1982, the New York Court of Appeals denied a motion for leave to appeal in a case involving the use of keeplock as a disciplinary measure (see Matter of Jermosen v Smith, 56 NY2d 711). This court has interpreted the Jermosen line of decision as a rejection óf the Second Circuit’s holding in Powell (supra) (see memorandum decision dated Aug. 2, 1982, Matter of Jermosen v Smith, index No. 10,095). Whatever the current status of the Hughes case (supra), this court no longer believes that it forbids the imposition of keeplock without a prior hearing.
Counsel for the petitioners also claims that applicable regulations require that an inmate be given, on the record, a specific reason for confinement prior to a hearing. Attention has been drawn to 7 NYCRR 251.6 (a) which provides as follows: “Where an officer has reasonable grounds to believe that an inmate should be confined to his cell or room because he represents an immediate threat to the safety, security or order of the facility or an immediate danger to other persons or to property, such officer shall take reasonable and appropriate steps to so confine the inmate.” However, this section does not require that the inmate ever receive a written determination as to why such confinement was necessary. It does expressly require that the superintendent be given written notice of the reason for such confinement (see 7 NYCRR 251.6 [e] [1]). This written notice was provided in each misbehavior report filed in this matter. It is reasonable for the respondents to interpret 7 NYCRR 251.6 as authorizing keeplock whenever an officer reasonably believes that a facility rule has been violated by an inmate, thus establishing an “immediate threat” to the “order of the facility”.
Although the respondents need not afford an inmate a hearing prior to the imposition of keeplock, this does not mean that an inmate will be held indefinitely without the benefit of any proceedings. In a memorandum of Deputy *456 Commissioner William C. Donnino dated March 12, 1975, the Department of Correctional Services adopted a policy whereby confined inmates should be afforded an adjustment committee hearing within three days. This policy is binding upon the respondents (see Powell v Ward, 542 F2d 101, 103; Matter of Johnson v Smith, 83 AD2d 721).
Under the computation method set forth in section 20 of the General Construction Law, this time period was complied with in all of the instant disciplinary actions. It also appears that each inmate was written up in the late evening and was afforded an adjustment committee hearing on the following day, except for inmates written up on Friday evening, who received hearings on the next Monday. It, therefore, appears that the respondents have complied with 7 NYCRR 252.3 (f) which requires that an inmate confined in his cell, receive a hearing at the next meeting of the adjustment committee.
It is also claimed that these disciplinary proceedings violated the petitioners’ religious rights. In Abdullah (115 Misc 2d 105, supra), this court • expunged similar reports filed against an inmate for violating the same rule upon which the instant reports were based: that there be no religious services in the recreation yard. In light of the duty of the Moslems to perform prayers at specific times of the day, this court felt that it violated their religious rights to force them to give up their recreation period in order to perform this “salut”.
Although the court recognized that other inmates might become jealous if they witnessed a group “service” in the yard, it did not feel that it was necessary for the petitioners to give up their recreation time to accommodate this security concern. This court, therefore, issued an order: “that the respondents cease enforcing rule 17.9 so as to punish Moslem inmates for saying 10-minute individual prayers in an orderly fashion in the recreation yard, or allow them access' to their cells during such times.” (See Matter of Abdullah v Smith, 115 Misc 2d, at p 109, supra; emphasis added.)
Although the order was stayed in July and August by effect of the respondents’ pending appeal, the petitioners still have a right to petition this court for relief if they feel *457 that the respondents have violated their right to freedom of worship (see Correction Law, § 610, subd 3). Therefore, this court must still decide whether or not the respondents violated the petitioners’ religious rights by maintaining records which indicate that these inmates violated a facility rule.
Along with the amended answer, the Assistant Attorney-General has submitted an affidavit of superintendent Harold Smith dated August 24, 1982, which sets forth his policy for enforcing rule 17.9. This policy allows Sunni Moslems to leave the recreation yard in order to say prayers in their cells. This affidavit indicates that at 9:00 P.m. such inmates may return to the yard for the remaining recreation period which concludes at 10:00 p.m. This policy is intended to allow required prayers without sacrificing their recreation period. This court believes that such a policy substantially complies with the April 28,1982 order and does not violate the petitioners’ religious rights under the Abdullah memorandum.
However, it is unclear that the petitioners were notified of superintendent Smith’s interpretation of the rule when they were subjected to disciplinary proceedings. According to a memorandum from deputy superintendent James dated July 28, 1982, inmates were informed that they would be allowed to return to their cells at 8:20 p.m. each night. This memorandum does not, however, show that inmates were informed of their right to return to the yard at 9:00 p.m.
If inmates were clearly informed, by posting, of superintendent Smith’s interpretation of rule 17.9, this court believes that it would be fair to discipline them for refusing to leave the yard in order to observe their prayers in their cell and then return to the yard in an orderly fashion. Without proof of such notice in a posted memorandum or specific findings of such an opportunity in each disciplinary hearing, this court cannot conclude that the inmates were not forced to choose between saying their prayers and giving up their recreation period. Forcing them to make this choice violates their religious rights as interpreted in Abdullah (supra). In absence of proof that they were aware of an acceptable alternative to prayer in *458 the yard, the record o^ these disciplinary actions should not be used against them and should be expunged from their records.
Relief is also justified by the unauthorized suspension of all exercise rights. According to 7 NYCRR 301.5 (b), “every inmate shall be permitted to exercise outside of his cell for at least one hour each day and, where weather permits, such exercise shall be permitted out-of-doors.” This provision is applicable as a minimum requirement “throughout the correctional facility and in all cells, cell blocks and housing units (including special and segregation housing units)” (see 7 NYCRR 301.1). Although the guarantee of one-hour daily exercise applies throughout the facility, in the absence of an emergency, it may only be suspended while an inmate is in special confinement.
The regulations provide for a five-day suspension of exercise while an inmate awaits a disciplinary hearing or is confined pursuant to a hearing (7 NYCRR 301.5 [d]). An inmate in a special housing unit (S.H.U.) may have his exercise suspended if there “is imminent danger that an inmate will do injury to himself or to another if permitted to go outside his cell” (7 NYCRR 301.5 [c]). None of these exceptions are applicable in the instant case.
This court believes that it is irrational for the respondents to interpret these regulations so as to not guarantee one hour of daily exercise to inmates in general population. The “exercise” provided for in the minimum standards contemplates more than movement to the dining hall and participation in programs. This court believes that use of the word “exercise” guarantees some opportunity for physical exertion such as calisthenics or running. Although inmates in general population may move through the facility and participate in programs, such activities do not provide the physical benefits afforded by exercise. Furthermore, inmates in general population may not even be in programs which allow even such limited movement. They may have other privileges suspended which further restrict their activity.
Under the respondents’ application of the regulations in this case, an inmate sentenced to 10 days in S.H.U. would be guaranteed daily exercise after five days. An inmate *459 released from special confinement after five days could return to his cell with no privileges and no right to exercise for several more days. This court, therefore, believes that the respondents could be justified in suspending the petitioners’ use of the recreation yard as a disciplinary measure, but must afford inmates in general population at least one hour of daily exercise under conditions available to inmates in S.H.U. Although the absence of such exercise is not enough in and of itself to establish cruel and unusual punishment, it is a factor courts have looked to in considering such issues (see Sostre v McGinnis, 442 F2d 178). The provision of such exercise should, therefore, be accorded some importance.
The instant misbehavior reports and resulting adjustment committee reports are, therefore, hereby ordered expunged from the petitioners’ institutional records.