**Peter PERANZO, Isadore Felix, Oscar Roman, Ferdinand Frilando, Robert Lawrence, Marcella Phipps, James Boyd, on behalf of themselves and all others similarly situated, Plaintiffs,**

**v.**

**Thomas A. COUGHLIN, III, Commissioner, New York State Department of Correctional Services, and Ramon Rodriguez, Chairman of the New York State Board of Parole, Gerald M. Burke, Joseph V. Salo, William J. Barnwell, Maurice Dean, Theodore Kirkland, Manuel Perron, Irving Greenberg, Maria Buchanan, Samuel D. Sherrid, Joseph Mulholland, Barbara Treen, and J. Kevin McNiff, Commissioners of New York State Board of Parole, in their Official Capacities, Defendants.**

**No. 84 CIV 8787 (LBS).**

United States District Court,
S.D. New York.

Oct. 26, 1987.

Prisoners' Legal Services of New York, New York City, for plaintiffs; William D. Gibney, John A. Gresham, David C. Leven, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for defendants; Maryellen Chomsky, Asst. Atty. Gen., of counsel.

OPINION

SAND, District Judge.

In this class action brought by New York State prisoners against individual employees of New York's Department of Correctional Services (DOCS) and Board of Parole, the plaintiffs allege that the Syva Company's EMIT-st urinalysis drug test as

performed by DOCS is so unreliable as to render the use of the results as evidence in a disciplinary hearing and in parole decisions a denial of due process. The defendants claim that the tests are sufficiently reliable to be admissible as evidence at a disciplinary proceeding and in parole decisions, and even to be the only evidence supporting disciplinary action, but admit that they cannot create an irrebuttable presumption of drug use.

The defendants move for summary judgment. To grant a motion for summary judgment under Rule 56 of the F.R.Civ.P., a court must find that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law because, after sufficient time for discovery, the non-moving party has failed to make a sufficient showing of an essential element of its case as to which it has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). We grant the motion for the reasons described below.

### PROCEDURAL HISTORY

In May, 1985, we denied a motion to dismiss this case and requested that a study of the reliability of EMIT testing as performed by DOCS be undertaken. (*Peranzo v. Coughlin*, 608 F.Supp. 1504 (S.D.N.Y.1985)). A month later, in June, 1985, the Supreme Court in *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S. 445, 454, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 536 (1985) held that, assuming "good time" to be a protected liberty interest, the relevant due process standard of review as to disciplinary action revoking good time credits is that there must be "some evidence" in the record to support the decision of the disciplinary board. *See also Freeman v. Rideout*, 808 F.2d 949, 954 (2d Cir.1986). The Court also described the requisite amount of evidence as "a modicum of evidence." 472 U.S. at 455, 105 S.Ct. at 2774. Balancing the liberty interest of the individual prisoner against the needs of the institution (*id.* at 454, 105 S.Ct. at 2773), the Court specifically declined "to adopt a more stringent evidentia-

ry standard as a constitutional requirement." *Id.* at 456, 105 S.Ct. at 456.

At a conference in January, 1986 we suggested that the parties attempt to agree on terms for a study of the reliability of the DOCS procedures. The parties never reached such an agreement, but meanwhile DOCS has, on its own, conducted a study of its procedures under the auspices of the American Association of Bioanalysts (AAB). The AAB Proficiency Testing Service is one of three testing services approved by the Federal Centers for Disease Control. *See* Affidavit of Nicholas Serafy, Associate Director of AAB Proficiency Testing Service, in Support of Motion, dated March 27, 1987, at 2.

### RELIABILITY OF EMIT TESTING

It is well established that, before a prisoner can be deprived of his state-created liberty interest in "good time" or confined in disciplinary isolation, prison officials must conduct a hearing that comports with due process. *Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *Powell v. Ward*, 643 F.2d 924 (2d Cir.), *cert. denied*, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). It is also clear that, while there is no inherent constitutional right to parole (*Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)), a state may by its parole policies create a liberty interest in parole. *Russo v. New York State Bd. of Parole*, 50 N.Y.2d 69, 74–75, 405 N.E.2d 225, 227, 427 N.Y.S.2d 982, 984 (1980). In our prior opinion, we discussed at length the procedures required by New York State regulations and implemented by DOCS prior to the taking of any disciplinary action. *See Peranzo*, 608 F.Supp. at 1505–06. We noted that "the critical issue in this case relates to the reliability of the EMIT test as a basis for imposing disciplinary sanctions against inmates." *Id.* at 1507.

In the AAB study, which is apparently still ongoing, participants rehydrate dried "spiked" urine samples provided by the AAB, test the samples, and send their find-

ings to the AAB. DOCS has submitted to the Court the results of some 3,067 proficiency tests performed by various DOCS facilities as a part of the AAB study. Those tests include 730 in which a DOCS facility found some specified drug to be "present." In only nine instances did a facility find a drug to be "present" when the reference laboratories found it "absent." (For due process purposes, of course, we are concerned only with false positives, not with false negatives.) Based on these proficiency reports, DOCS facilities have an accuracy rate of over 99.7% if one considers all 3,067 tests, or of 98.7% if one considers only the 730 "positive" tests. *See* Affidavit of Maryellen Chomsky, Assistant Attorney General, in support of motion, dated July 24, 1987 at 3–4, and Ex. A thereof, *and see* Affidavit of Donald Selsky, Director of DOCS Special Housing/Inmate Disciplinary Programs, in support of motion, dated March 31, 1987 at 4–5, and Ex. B thereof.

Plaintiffs complain that the fact that this was "open" rather than "blind" testing may have skewed the results in favor of DOCS, that is, that the fact that participants knew they were being tested may have led them to take greater than usual care in performing the urinalysis. They have presented evidence of many of the ways in which human error can lead to a false negative or a false positive result. *See* Reply Affidavit of John Whiting, Ph.D., expert witness, in opposition to motion, dated August 19, 1987. They request again that confirmatory studies be made of EMIT tests performed on inmates' urine by DOCS personnel.

The study contemplated by the plaintiffs would last approximately five months, and would cover about 350 specimens in some 20 facilities, at a cost of about $20,000. We find persuasive the defendants' argument that even confirmatory studies of the results of EMIT testing of inmates' urine, as requested by plaintiffs, would be "open" tests because of the need to retain, seal, label, freeze and ship tested specimens to an outside laboratory for confirmatory testing. We think that the AAB study, showing the results over 3,000 proficiency tests

performed at some 40 facilities over a period of four years, provides sufficient evidence of the level of training and expertise of DOCS personnel.

Plaintiffs also complain that there is a danger of cross-reactivity with drugs legally made available to prisoners by prison officials or consumed when out on furlough, and with poppy seeds. They complain that no regulation specifically requires the officer performing the test to check listings of potentially cross-reactive drugs. Plaintiffs particularly refer to ibuprofen, found in Actifed and Motrin, and to fenoprofen and naproxen.

An affidavit from the Group Leader of the Clinical Studies Department of Syva indicates that neither ibuprofen nor naproxen affects any of the EMIT assays as they are currently formulated, that very few false positives have been produced by any cross-reactivity under current formulas, and that all known cross-reactants (including fenoprofen for some assays) are listed in Syva's package inserts. *See* Affidavit of Jay Gorsky in support of motion, dated July 23, 1987. An affidavit of a DOCS Legal Research Specialist states that EMIT operators in all facilities routinely ask tested inmates about any medication they might be using, and/or check the medical records of tested inmates. *See* Affidavit of Nancy Heywood in Support of Motion, dated July 24, 1987. The Gorsky Affidavit further indicates that Syva has received and responded to inquiries from DOCS personnel about EMIT assays, including questions about suspected cross-reactants. *See* Affidavit of Jay Gorsky, *supra*, at 3.

An affidavit from DOC's Director of Special Housing/Inmate Disciplinary Programs shows that, in recognition of the problem of cross-reactivity with poppy seeds, DOCS is developing a policy that will eliminate the availability of poppy seeds to inmates. *See* Affidavit of Donald Selsky in Support of Motion, dated July 24, 1987, at 3. With respect to testing performed upon an inmate's return from furlough, we note that it is possible to make it a condition of furlough that the prisoner not consume poppy seeds. *See* "Snack on Poppy Seed

Bagel Lands Man Back in U.S. Jail," N.Y. Times, Sept. 21, 1987, at B–3, col. 1.

In a recent decision under the *Superintendent v. Hill* standard, the Eighth Circuit has held that "the EMIT test, as used at Iowa State Penitentiary with a confirmatory second test, contains sufficient indicia of reliability to provide some evidence of drug use." *Spence v. Farrier*, 807 F.2d 753, 756 (8th Cir.1986). The *Spence* Court noted that "[a]lthough it is conceivable that an inmate could be unjustly disciplined as a result of EMIT tests, the margin of error is insignificant in light of institutional goals." *Id.*

As we stated in our earlier opinion, courts have recognized that "due process is not synonymous with a requirement of scientific exactitude or error-free procedure." *Peranzo, supra,* 608 F.Supp. at 1507, citing *Greenholtz, supra,* 442 U.S. at 7, 99 S.Ct. at 2104. We continued by noting that even with respect to one of the most fundamental of individual rights—the right to an accurate determination of guilt at a criminal trial—it is not required that the government prove guilt beyond all possible doubt, but only beyond a reasonable doubt. Like the Iowa system described in *Spence,* New York's procedures allow prisoners to present defenses and rebuttal evidence in a disciplinary hearing. *See* 7 NYCRR §§ 253–54. We now find that, with a 98+% rate of accuracy, the double EMIT testing as performed by DOCS is sufficiently reliable so that the use of the results as evidence, even as the only evidence, in a disciplinary hearing does not offend due process. We further find that the introduction of the results as an element to be considered in parole decisions does not offend due process.

### PRE–HEARING DETENTION

■ Plaintiffs next challenge DOCS procedures under which a prisoner may be kept in his own cell or in disciplinary housing prior to a disciplinary hearing "solely on the basis of EMIT tests." They assert two bases for the challenge: first, that the EMIT tests are unreliable, and second, that even if reliable they do not establish that an inmate is a danger to the facility, and thus such confinement violates an inmate's liberty interests.

We have dealt with the reliability issue above, and thus we will here consider only the second issue with respect to prehearing confinement.

Defendants do not contest the assertion that New York's statutes and regulations create a liberty interest in an inmate's remaining in the general prison population. They argue, however, that under *Bolden v. Alston,* 810 F.2d 353 (2d Cir.1987), such confinement pending an investigation predicated upon positive results of a double EMIT test is administrative confinement rather than disciplinary confinement. Thus, they argue, they need satisfy only the lesser due process standards set forth in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) prior to placing an inmate in administrative confinement. *Hewitt* requires that within a reasonable time following an inmate's transfer, a facility must give him notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. *Id.* at 476 and n. 8, 103 S.Ct. at 874 and n. 8.

Plaintiffs do not challenge the New York regulations themselves, but rather rely on them in suggesting that DOCS fails to live up to them when it places prisoners in pre-hearing detention. The regulations, in relevant part, state that an inmate may be confined to his cell or room when he "represents an immediate threat to the safety, security or order of the facility or [an] immediate danger to other persons or property" (7 NYCRR § 251–1.6(a)), and that an inmate may be taken from his cell or room and confined in the special housing unit (disciplinary housing) if his behavior "is disruptive or will be disruptive of the order and discipline of the housing unit, or is inconsistent with the best interests of the inmate or of the facility." (7 NYCRR § 251–1.6(d)). In deciding a case under an earlier version of these ˜egulations, after the Supreme Court's decision in *Hewitt,* a New York Supreme Court stated that "[i]t

is reasonable for the respondents to interpret § 251.6 as authorizing keeplock whenever an officer reasonably believes that a facility rule has been violated by an inmate, thus establishing an 'immediate threat' to the 'order of the facility.'" *Bowe v. Smith*, 119 Misc.2d 453, 465 N.Y.S.2d 391, 393 (N.Y.Sup.Ct., Wyo.Co., 1983). *Hewitt* recognized that isolation pending an investigation into wrongdoing "serves important institutional interests relating to the insulating of possible witnesses from coercion or harm." 459 U.S. at 473, 103 S.Ct. at 872.

Defendants state, and plaintiffs do not controvert, that isolation of an inmate under investigation after a double positive EMIT test is not automatic, but rather is discretionary. They point out that, in any case, if an inmate is so confined he must receive a disciplinary hearing or superintendent's hearing within seven days. *See* 7 NYCRR § 251–5.1(a).

Under *Turner v. Safley*, —— U.S. ——, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), a prison regulation "is valid if it is reasonably related to legitimate penological interests." The Court found that "such a standard is necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Id.*, quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); *see also O'Lone v. Estate of Shabazz*, —— U.S. ——, 107 S.Ct. 2400, 2407, 96 L.Ed.2d 282 (1987). We find that the described confinement is administrative confinement permissible under *Bolden v. Alston.*

SO ORDERED.