**Michael PELLA, Plaintiff,**

v.

**Paul ADAMS, et al., Defendants.**

**No. CV–R–85–98–ECR.**

United States District Court,
D. Nevada.

Dec. 22, 1988.

James W. Wessel, Carson City, Nev., for plaintiff.

Brian McKay, Atty. Gen., Carson City, Nev., for defendants.

### ORDER

EDWARD C. REED, Jr., Chief Judge.

STATEMENT OF THE CASE

The matter before the Court is a civil rights action filed under 42 U.S.C. § 1983 by plaintiff Pella, an inmate at Northern Nevada Correctional Center ("NNCC"). Pella alleges that the three-member disciplinary committee at NNCC violated his constitutional due process rights when they found him guilty of ingesting marijuana. He argues that the defendants, the members of the disciplinary committee, did not have sufficient evidence to find him guilty because the urinalysis test relied on by them was scientifically flawed. In addition, Pella argues that the defendants violated his due process rights by refusing to allow him to obtain, at his own expense, an alternative urine test.

The factual background of this case was set forth thoroughly in this Court's previous order denying the defendants' motion for summary judgment.[1] *See Pella v. Adams*, 638 F.Supp. 94, 95–96 (D.Nev. 1986). In brief, Pella's disciplinary hearing arose from a routine search of his cell in which a correctional officer discovered several small seeds and a green leafy substance. On the basis of these findings, Pella was required to produce a urine sample. This urine sample was transported to the Washoe County Sheriff's Criminalistic Laboratory and analyzed through the Enzyme Multiple Immunoassay Test ("EMIT" test). This test yielded a positive result, indicating the presence in Pella's urine of Delta–9–tetrohydrocannabinol (THC), the principal psychoactive ingredient of marijuana and hashish. The Crime Lab then repeated the EMIT test and confirmed that Pella's urine tested positively.

The evidence presented to the disciplinary committee consisted of the positive urinalysis test results and a written report describing the seeds and green leafy substance found in Pella's cell. The seeds and the leafy substance were not chemically analyzed and no evidence as to their chemical composition was reported to the disciplinary committee. At his disciplinary hearing, Pella proclaimed his innocence and requested that his urine sample be retested, at his own expense, through a scientific method other than the EMIT test. The disciplinary committee denied this request without articulating a reason for the denial.

Based on the EMIT test results and the written description of Pella's cell, the disciplinary committee found Pella guilty of in-gesting marijuana, a major violation of the Code of Penal Discipline.[2] The committee sentenced him to fifteen days of disciplinary detention and referred the case to the Nevada Board of Parole Commissioners. The Parole Board relied on the same evidence that was presented to the disciplinary committee and revoked one hundred days of Pella's statutory good time credit.

This matter is now before the Court on a trial de novo as to the merits of Pella's due process claims. Pursuant to an order of this Court and based on stipulations from both parties, this case is being tried through sworn deposition testimony and trial briefs, and without live witness testimony or oral arguments. *See* Stipulation filed April 25, 1988. Both parties have agreed to employ the same expert to testify regarding the reliability and accuracy of the EMIT test, Dr. Roger Ritzlin, the director of toxicology at Sierra Nevada Laboratories. *See* Deposition of Dr. Ritzlin at 4:11–23 (July 13, 1988) (hereinafter "Ritzlin Depo"); Minute Orders of July 29 and July 31, 1987. We have previously ruled that the competence of the technician who performed the EMIT tests is not a proper subject for judicial review. *Pella*, 638 F.Supp. at 96–97. Hence, the only issues at trial are whether the defendants violated Pella's due process rights by relying on the EMIT test or by denying him access to alternative urinalysis tests.[3]

## FINDINGS OF FACT

This Court has reviewed the uncontraverted testimony of Dr. Ritzlin and finds it to be credible. According to Dr. Ritzlin, the EMIT test consists of mixing a urine sample with an antibody solution. If the

1. While this Order denied the defendants' motion for summary judgment as to Pella's due process claims, it granted the motion as to several other claims. *See Pella*, 638 F.Supp. at 98–99.

2. Defendants also contend that Pella admitted his guilt at the disciplinary hearing when he stated that he could produce a negative urine sample because he had "cleaned himself up." Defendants admit, however, that Pella's statement reasonably could have been interpreted to mean that he had "cleaned himself up" since he began serving his prison sentence. We need not resolve this conflict since the evidentiary value of this ambiguous statement plays no role in our decision.

3. Another issue which this Court preserved for trial was Pella's pendent state law claim of intentional infliction of emotional distress. *Pella*, 638 F.Supp. at 98–99. In his deposition testimony, however, Pella never alleges that he suffered any emotional distress from the defendants conduct. Furthermore, in his claim for damages in his trial brief, Pella does not seek any damages for emotional distress. Accordingly, we conclude that Pella has abandoned his claim of intentional infliction of emotional distress.

THC compound found in marijuana is present in the urine sample, it will increase the reaction in the system and, thereby, generate a positive test result. Ritzlin Depo at 9:6–8. Other compounds, however, including certain over-the-counter medications, can also react with the antibody solution and produce a positive test result. *Id.* at 9:17–19. Such positive test results, which are not caused by the presence of THC, and which can occur for a variety of reasons, are called "false positives." *Id.* at 8:4–10.

Due to the possibility of a false positive result, the EMIT test is not 100% accurate. Even when an initial positive result is confirmed through a second EMIT test, such confirmation does not guarantee that the tested individual has been using marijuana or hashish. A second positive result simply confirms that the proper technical procedures were followed in performing the tests. The same non-THC compound or other mystery factor that caused a false positive result in an initial EMIT test could also produce a false positive in the second EMIT test. *Id.* at 11:6–18.

Nevertheless, Dr. Ritzlin testified that the EMIT test generally yields accurate results. Assuming the test is performed correctly, the accuracy rate of EMIT tests is "considerably over 90%." *Id.* at 15:5–11; 19:17–24. Indeed, if the test is done by qualified laboratory technicians and the results are confirmed by a second EMIT test, Dr. Ritzlin estimated that the incidence of false positive results could be as low as 1–2%. *Id.* at 15:5–11. Furthermore, Dr. Ritzlin stated that the EMIT test is relatively inexpensive, costing between $10 to $15 per test. *Id.* at 10:18–21.

In contrast, Dr. Ritzlin testified that the most accurate method of urinalysis costs approximately $45 per test. *Id.* at 10:11–24. This more expensive method is known as the Gas Liquid Chromatograph–Mass Spectrometer Test ("GLC–MS" test). It is, for all practical purposes, 100% accurate in determining precisely which drugs have been used by the tested individual. *Id.* at 12–13:24–1. Consequently, Dr. Ritzlin suggested that when accuracy is a paramount concern, the GLC–MS test should be used in conjunction with the EMIT test. *Id; see also id.* at 16:7–22; 24:2–12. Under such a program, the EMIT test would be used to screen urine samples at an initial low cost and then, if a positive result occurs, the GLC–MS test would be used to ensure that the result was not a false positive.

CONCLUSIONS OF LAW

### A. *Prison's Use of the EMIT Test*

■ Pella's first argument is that on the basis of the evidence presented at his disciplinary hearing, the disciplinary committee could not find him guilty of ingesting marijuana. He argues that due to the degree of inaccuracy inherent in the EMIT test, the disciplinary committee could not constitutionally base its finding of guilt on the results of such a test.

In general, prison disciplinary proceedings are subject to a minimal level of judicial review. The United States Supreme Court has recognized that "[p]rison disciplinary proceedings take place in a highly charged atmosphere" and that "[r]evocation of good time credits is not comparable to a criminal conviction." *Superintendent, Mass. Correctional Ins. v. Hill,* 472 U.S. 445, 456, 105 S.Ct. 2768, 2774, 86 L.Ed. 2d 356 (1985); *see also Ponte v. Real,* 471 U.S. 491, 498–500, 105 S.Ct. 2192, 2196–97, 85 L.Ed.2d 553 (1985); *Wolff v. McDonnell,* 418 U.S. 539, 560–72, 94 S.Ct: 2963, 2976– 82, 41 L.Ed.2d 935 (1974). Accordingly, the Court has held that the "requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits." *Hill,* 472 U.S. at 455, 105 S.Ct. at 2773. This "some evidence" standard does not require that the evidence presented to the prison disciplinary committee comply with the Federal Rules of Evidence. It requires merely that the decision of the prison disciplinary committee have "some basis in fact." *Id.* at 456, 105 S.Ct. at 2774. Of course, the factual basis relied on by a prison disciplinary committee must also have "some indicia of reliability." *Cato v. Rushen,* 824 F.2d 703, 705 (9th Cir.1987).

Many courts recently have examined the scientific accuracy and validity of EMIT

urinalysis tests. These courts have reviewed the testimony of expert scientific witnesses and have found that when an initial EMIT test is confirmed with a second EMIT test, the accuracy rate of the testing procedure is between 95% and 99%. *See, e.g., Harmon v. Auger,* 768 F.2d 270, 276 (8th Cir.1985) (finding EMIT test results to be 95% accurate); *Peranzo v. Coughlin,* 675 F.Supp. 102, 103–05 (S.D.N.Y.1987) (relying on an American Ass'n of Bioanalysts' study which found that over 98% of the 730 positive EMIT tests performed by New York's Dep't of Corrections were accurate indications of drug use), *aff'd,* 850 F.2d 125 (2d Cir.1988); *Jensen v. Lick,* 589 F.Supp. 35, 38–39 (D.N.D. 1984) (citing a Center for Disease Control study which found EMIT tests to be 97–99% accurate).

On the basis of such scientific evidence, all the federal courts that have considered the issue have held that the use of EMIT test results in the context of prison disciplinary proceedings does not violate an inmate's due process rights. These federal courts unanimously have concluded that a positive EMIT test result, confirmed by a second EMIT test, is sufficiently reliable so as to constitute "some evidence" of drug use. *Spence v. Farrier,* 807 F.2d 753, 756–57 (8th Cir.1986); *Adkins v. Martin,* 699 F.Supp. 1510 (W.D.Okla.1988) (Westlaw, Dct database); *Peranzo,* 675 F.Supp. at 105; *Wykoff v. Resig,* 613 F.Supp. 1504, 1512 (N.D.Ind.1985); *Jensen,* 589 F.Supp. at 39; *see also In re Johnston,* 109 Wash.2d 493, 745 P.2d 864, 868 (1987) (en banc) (positive result in a single EMIT test constitutes sufficient evidence to uphold a prison disciplinary committee's imposition of sanctions); *Smith v. State,* 250 Ga. 438, 298 S.E.2d 482 (1983) (positive EMIT test result, standing alone, is sufficient evidence to uphold a parole revocation). *But cf. Higgs v. Wilson,* 616 F.Supp. 226, 230–33 (W.D.Ky.1985) (enjoining prison authorities from punishing inmates on the basis of a single, unconfirmed EMIT test), *vacated sub nom., Higgs v. Bland,* 793 F.2d 1291 (6th Cir.1986).

In the case at bar, Dr. Ritzlin testified that the accuracy rate of the EMIT test is "considerably over 90%." Ritzlin Depo at 15:5–11. He also indicated that if the test is performed by skilled technicians, and confirmed by a second EMIT test, the accuracy rate may be as high as 98–99%. *Id.* This testimony is in accordance with the scientific evidence that has been presented in other courts regarding the validity of EMIT test results. *See Harmon,* 768 F.Supp. at 276; *Peranzo,* 675 F.Supp. at 103–05; *Jensen,* 589 F.Supp. at 38–39.

■ On the basis of Dr. Ritzlin's testimony and the aforementioned case law, we find that the results of an EMIT test, when confirmed by a second EMIT test, are sufficiently reliable so as not to violate a prison inmate's due process rights. The available scientific evidence shows that the testing procedure employed by the defendants in this case has a very small incidence of false positive results. While an inmate might be unjustly disciplined due to the possibility of a false positive result, the due process clause does not guarantee scientific exactitude in the context of prison disciplinary proceedings. The due process clause merely requires prison disciplinary committees to base their decisions on "some evidence" that has an indicia of factual reliability. The general accuracy of the double EMIT testing procedure used by the defendants in the instant case certainly satisfies this minimal standard.

■ We hold, therefore, that the defendants did not violate Pella's due process rights by finding him guilty of ingesting marijuana primarily on the basis of a positive EMIT test result that was confirmed by a second EMIT test. Furthermore, we hold that the due process clause does not prohibit prison disciplinary committees from finding inmates guilty of drug use where the sole evidence presented against the inmate is the positive results of an EMIT test and a confirmatory EMIT test.

### B. *Inmate's Request for Alternative Urinalysis Testing*

■ Pella's second argument is that the defendants violated his due process rights by refusing to allow him to have his urine

sample analyzed through the method of his choice. Pella has testified that, at his disciplinary hearing, he requested and offered to pay for a urinalysis test other than the EMIT test. Deposition of Michael Pella at 7:15–25; 12:17–20 (July 13, 1988) (hereinafter "Pella Depo"). Pella has also testified that despite his financial ability to pay for an alternative test, such as the essentially 100% accurate GLC–MS test, the defendants denied his request. *Id.* at 8:1–6; 12:17–24. While two of the members of the disciplinary committee do not recall whether Pella requested an alternative urinalysis test, the third defendant testified that Pella had indeed offered to pay for his own test. Deposition of Howard Pyle at 15:1–7 (July 15, 1988) (hereinafter "Pyle Depo"). No evidence has been presented to this Court as to why the defendants refused to allow Pella to order and pay for the urinalysis test of his choice.

As previously noted, prison disciplinary proceedings are not criminal prosecutions. Consequently, an inmate accused of violating a prison rule is not entitled to the full panoply of due process rights guaranteed to a criminal defendant. *Wolff,* 418 U.S. at 556, 94 S.Ct. at 2974; *Harrison v. Pyle,* 612 F.Supp. 850–854 (D.Nev.1985). Instead, the procedural rights afforded an inmate must represent a "mutual accommodation" between generally applicable due process rights and the special needs and objectives of penal institutions. *Wolff,* 418 U.S. at 556, 94 S.Ct. at 2974. In general, the Supreme Court has held that in regard to a prison disciplinary proceeding, an inmate's due process rights include: (1) at least 24–hour written notice of the disciplinary charges; (2) a written statement of the evidence relied on by the disciplinary committee; and (3) a qualified right to call witnesses and present documentary evidence in his defense. *Id.* at 563–67, 94 S.Ct. at 2978–80.

An inmate's right to call witnesses and present evidence necessarily is limited by the need of prisons to preserve security and to provide efficient and effective discipline. *Id.* at 566, 94 S.Ct. at 2979; *see also Ponte,* 471 U.S. at 495–96, 105 S.Ct. at 2195; *Baxter v. Palmigiano,* 425 U.S. 308, 321, 96 S.Ct. 1551, 1559, 47 L.Ed.2d 810 (1976). "Prison officials must have the necessary discretion to keep [prison disciplinary] hearing[s] within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority ..." *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979. Thus, an inmate has no right to collect evidence or call witnesses where permitting him to do so would be "unduly hazardous to institutional safety or correctional goals." *Ponte,* 471 U.S. at 495, 105 S.Ct. at 2195 (quoting *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979); *see also Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 175, 66 L.Ed.2d 163 (1980); *Baxter,* 425 U.S. at 320–21, 96 S.Ct. at 1559, *Harrison,* 612 F.Supp. at 854.

Nevertheless, prison officials cannot arbitrarily prevent inmates who are subject to disciplinary proceedings from calling witnesses and collecting evidence. Prison officials must have a legitimate peneological reason for limiting an inmate's efforts to defend himself before a prison disciplinary committee. *Ponte,* 471 U.S. at 498–99, 105 S.Ct. at 2196–97; *Harrison,* 612 F.Supp. at 855.

In the case at bar, the defendants denied Pella an opportunity to collect evidence that might have exonerated him of the charge of ingesting marijuana. The deposition testimony before this Court shows that, at his disciplinary hearing, Pella offered to pay for an alternative testing of his urine sample. Presumably, Pella was willing to pay for a test that would eliminate the chance of a false positive result, such as the GLC–MS test. Indeed, assuming that Pella actually had not used marijuana, results from a more accurate test were the only type of evidence that conclusively could have refuted the EMIT test results. Given the potential significance of the evidence that Pella sought to obtain at his own expense, the defendants must present a valid penological reason for denying Pella access to such evidence.

The defendants, however, have failed to address the issue of Pella's request for an alternative urinalysis test in either their deposition testimony or their trial brief.

Since Pella's trial brief focused almost exclusively on his challenge to the EMIT test, defendants' failure is understandable. Nevertheless, this Court cannot determine whether the defendants violated Pella's due process rights without an adequate record as to their reasons for refusing to permit Pella to purchase the urinalysis test of his choice.

IT IS, THEREFORE, HEREBY ORDERED that this matter is referred pursuant to 28 U.S.C. § 636(b)(1)(B) to United States Magistrate Phyllis Halsey Atkins for an evidentiary hearing. The subject of this hearing shall be the defendants' reasons for refusing to permit Pella to obtain an alternative testing of his urine sample. Both parties may present evidence and call witnesses at this hearing. Upon completion of this hearing, Magistrate Atkins shall submit her proposed findings of fact and conclusions of law to this Court. Both parties may object to these proposed findings and recommendations in accordance with our Local Rules of Practice and 28 U.S.C. § 636(b)(1).

IT IS FURTHER ORDERED that the date set by Magistrate Atkins for the aforementioned evidentiary hearing shall be within sixty (60) days of the date on which this Order is entered.