Nathaniel JONES, Jr., Appellant,

v.

UNITED STATES, Appellee.

No. 86–31.

District of Columbia Court of Appeals.

Argued May 19, 1988.
Decided Sept. 9, 1988.

Matthew C. Leefer, for appellant.

Thomas J. Tourish, Jr., Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., at the time the briefs were filed, and Michael W. Farrell, Elizabeth Trosman, Washington, D.C., and Sherri L. Berthrong, Asst. U.S. Attys., were on the brief, for appellee.

Before FERREN, ROGERS, and STEADMAN, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant Nathaniel Jones, Jr., of possession of cocaine and of heroin with intent to distribute each. D.C. Code § 33–541(a)(1) (1988 Repl.). He now appeals, contending the trial court erred in admitting certain testimony by the government's narcotics expert and in admitting rebuttal testimony about the positive results of his drug tests using the so-called EMIT system, without providing expert testimony that EMIT has general acceptance in the scientific community. He also contends the evidence was insufficient to show that he had possessed the cocaine and heroin with intent to distribute, rather than for personal use. Finding no merit in any of these contentions, we affirm.

## I.

The government's evidence shows that appellant was arrested at approximately 1:00 in the afternoon on July 19, 1984, in the 400 block of 7th Street, S.W., near L'Enfant Plaza.[1] He was searched, and seventeen tinfoil packets and three clear plastic bags containing white powder were recovered from his sock. The tinfoil packets were subsequently found to contain cocaine, while the plastic bags were found to contain heroin. Officer Massey, one of the arresting officers, testified on cross-examination that he had not observed appellant engaging in any activity before his arrest indicating an attempt to sell narcotics. Massey further stated that, although he was not very familiar with the area, it was not one commonly known for narcotics traffic. A second arresting officer, Officer Scott, testified that no money was found on appellant at the time of his arrest.

The government called Detective Lawrence Coates as its narcotics expert. Detective Coates testified that the quantity of cocaine and heroin recovered from appellant would indicate that he had intended to distribute the drugs. Coates testified, moreover, that the way in which the drugs were packaged indicated that they had been prepared for sale. He characterized the tinfoil packets of cocaine as "executive hits," which sell for ten dollars, and indicated that they are so named because such packets are commonly sold at lunchtime around government buildings. Coates also testified that the cocaine, as packaged, would sell for $170, whereas the same quantity would sell for just $100 if packaged in bulk. Coates said that although the three packages of heroin comprised a quantity that could typically be for personal use, possession of the heroin together with the cocaine indicated an intent to distribute the heroin, which is sometimes used with cocaine in "speed-balling." Finally, Coates testified that sales of small amounts of cocaine are popular at lunchtime around government buildings such as the HUD building located near L'Enfant Plaza, an area with which Coates was familiar.

Appellant, testifying in his own behalf, said that he had witnessed the arrests of three persons in another part of town earlier on the day of his own arrest. One of those arrested, a woman, threw something away. Appellant, thinking he might find money, retrieved several items and discovered that they were not money but white powder in tinfoil and plastic, wrapped in toilet paper. Appellant took the items and put them in his sock, intending to find out what the white powder was and, if it turned out to be cocaine, to try it out of curiosity. He then travelled by bus and on foot to L'Enfant Plaza. Later, when he was leaving, the police arrested him as he ran to board a bus.

Appellant testified on cross-examination that he had not previously used cocaine nor did he on that day. In rebuttal, the government presented the testimony of an officer from the Drug Detection Unit of the Pretrial Services Agency, Johnny T. Jordan. Jordan testified that appellant's urine had tested positive for cocaine and PCP the day after his arrest. He also testified about the Agency's drug testing procedures, the test itself, and his knowledge of the general accuracy of the test results.

## II.

Appellant contends, first, that Detective Coates' testimony about the packaging and sale of so-called "executive hits" of cocaine was unfairly prejudicial and should have been excluded.

After Coates had testified on direct examination that the packages of cocaine found in appellant's possession were "executive hits, ten dollar hits of cocaine" so-called because "they are commonly sold during lunchtime around Government buildings," defense counsel immediately objected and asked for a mistrial. In response to defense counsel's charge that Coates had improperly tailored his testimony to the particular facts of the case, the

---

1. Appellant was arrested on suspicion of another crime, unrelated to the crimes charged in this case. The jury was not informed of the reason for his arrest.

court conducted a *voir dire* examination outside the jury's presence. Coates testified on *voir dire* as to the basis for his testimony and, specifically, to his personal knowledge of sales of cocaine in and around government buildings. The trial court then denied appellant's motion for a mistrial and permitted Coates to continue his testimony before the jury, instructing that he should "confine himself to things he knows from his expert knowledge." Coates then reiterated his testimony as follows:

Q. Detective Coates, are you familiar with the 400 block of 7th Street, Southwest, over near the HUD building?

A. Yes, ma'am.

Q. In your own personal knowledge, are you aware of any sales being done in that area or ever having been done in that area?

A. Yes, ma'am.

Q. What type of sales are you aware of?

A. We are talking about cocaine and again, a number of those buildings where I have been working out of the Narcotics Branch as well as supervising undercover officers, in all these buildings, not HUD exactly itself, but in the general area of the buildings, at lunchtime it's very popular for selling small amounts of cocaine.

Q. In that area, around Government buildings, does the packaging of cocaine have any particular street name?

A. Sure.

Q. What is that name?

A. They're called dime bags or executive hits.

■ The trial court has broad discretion to admit or exclude the testimony of expert witnesses, and we will disturb the trial court's ruling only if the ruling is clearly erroneous. *Hinnant v. United States,* 520 A.2d 292, 293 (D.C.1987); *Harris v. United States,* 489 A.2d 464, 470 (D.C.1985); *Hawkins v. United States,* 482 A.2d 1230, 1232 (D.C.1984); *Ibn–Tamas v.*

*United States,* 407 A.2d 626, 632 (D.C. 1979). To be properly admissible, the testimony of the expert must be helpful to the jury, *Jenkins v. United States,* 113 U.S. App.D.C. 300, 306, 307 F.2d 637, 643 (1962) (en banc), and must be more probative than prejudicial, *Ibn–Tamas,* 407 A.2d at 632.

■ These requirements were met in this case. Detective Coates' testimony illuminated for the jury the reasons why appellant might have been carrying cocaine packaged as this cocaine was and, further, offered a possible explanation, based on his extensive experience in the Narcotics Branch, as to what someone with seventeen packets of cocaine might be doing near a government building in midafternoon.[2] On the reasonable assumption that the average juror is not well-versed in the practices of the cocaine trade, the trial court, we believe, reasonably could have concluded that Coates' testimony would be highly informative. *See Hawkins,* 482 A.2d at 1232. That it bolstered the government's theory that appellant possessed the cocaine with intent to distribute does not render the testimony so prejudicial as to be inadmissible. *See Hinnant,* 520 A.2d at 293–94. To the contrary, the testimony was admissible precisely because it was probative of the central issue of appellant's possible intent.

### III.

■ Appellant contends, next, that for three reasons the trial court erred in admitting evidence about his prior drug use. In the first place, he says, the prosecutor's questions on cross-examination as to whether appellant had ever used cocaine were irrelevant to the criminal charge: possession with intent to distribute. Second, appellant argues, the subsequent admission of the government's rebuttal evidence in the form of Mr. Jordan's testimony about appellant's drug tests was highly prejudicial, and should have been excluded, because the particular drug test employed by the Pretrial Services Agency, the enzyme

---

**2.** We note that Detective Coates offered no opinion as to whether appellant was actually engaged in the sale of heroin and cocaine. Rather, he merely testified as to how and where such transactions normally occurred.

multiplied immunoassay technique (EMIT), was not proved generally accepted in the scientific community and reliably administered in this case. Finally, appellant contends, he could not adequately confront the drug test evidence because, in any event, Jordan lacked the necessary scientific expertise.[3]

## A.

■ Appellant's first concern is easily disposed of. The prosecutor's questions on cross-examination about appellant's prior cocaine use were relevant, and thus proper, in view of appellant's defense. Appellant testified that he had found the packets of cocaine and was unaware of their contents. He indicated, moreover, that he had intended to seek the advice of others, presumably more experienced with drugs than he, to determine before he tried it whether the white powder he had found was cocaine. In short, appellant attempted, on direct examination, to portray himself as an innocent bystander who had stumbled upon something illicit. The prosecutor's questions on cross-examination and the government's subsequent rebuttal evidence comprised legitimate exploration of two issues that appellant himself had raised: his sophistication with respect to drugs and his general credibility. *See United States v. James,* 181 U.S.App.D.C. 55, 60, 555 F.2d 992, 997 (1977); *United States v. Washington,* 150 U.S.App.D.C. 68, 463 F.2d 904 (1972).

## B.

The question whether EMIT tests are generally accepted in the scientific community is a question this court has not yet addressed. By no means, however, are we the first court to do so. *See, e.g., Spence v. Farrier,* 807 F.2d 753 (8th Cir.1986) (use of double EMIT test results as evidence in prison disciplinary hearings); *Wykoff v. Re-*

*sig,* 613 F.Supp. 1504 (N.D.Ind.1985) (use of unconfirmed EMIT test results as evidence in prison disciplinary hearings); *Smith v. State,* 250 Ga. 438, 298 S.E.2d 482 (1983) (use of EMIT test results as evidence in probation revocation hearing); *People v. Walker,* 164 Ill.App.3d 133, 115 Ill.Dec. 268, 517 N.E.2d 679 (1987) (use of double EMIT test results as sole evidence in probation revocation proceeding); *In re Johnston,* 109 Wash.2d 493, 745 P.2d 864 (1987) (en banc) (use of EMIT test results as evidence in prison disciplinary hearings).

### (1)

■ Because the EMIT test is a scientific technique, our inquiry is whether the test has become "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. United States,* 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923); *see also Ibn–Tamas,* 407 A.2d at 638; *Brown v. United States,* 384 A.2d 647, 650 (D.C.1978). "The requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice." *United States v. Addison,* 162 U.S.App.D.C. 199, 201–02, 498 F.2d 741, 743–44 (1974). If the technique has gained such general acceptance, we will accept it as presumptively reliable and thus generally admissible into evidence. The party opposing the evidence, of course, may challenge the weight the jury ought to give it. *See People v. Rogers,* 86 Misc.2d 868, 385 N.Y.S.2d 228, 237 (N.Y.Sup.Ct.1976).

Although not true of the present case, the question of admissibility of evidence attributable to the application of a scientific technique usually arises when a party attempts to qualify an expert witness to testify. *See, e.g., Ibn–Tamas,* 407 A.2d at 631–32, 637 (admissibility of testimony by clinical psychologist on phenomenon of "wife battering"). We believe it is impor-

---

**3.** Appellant suggests that the drug test records should not have been admitted because they are hearsay. Although defense counsel raised, but did not pursue, this argument at trial, it is clear that the test records, if properly certified, were admissible under the business records exception to the hearsay rule. *See Howard v. United*

*States,* 473 A.2d 835 (D.C.1984); Super.Ct.Crim. R. 57; *see also Smith v. United States,* 337 A.2d 219 (D.C.1975). The records contained "objective facts rather than expressions of opinion" and bore sufficient indicia of reliability to satisfy the applicable standard. *Howard,* 473 A.2d at 839.

tant to address the *Frye* test in this context because this will help in understanding our standard of review.

In evaluating the proffered expert, the trial court, first, applies the well known three-part test found in *Dyas v. United States*, 376 A.2d 827, 832, *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977).[4] Then, if the criteria are met, the court evaluates probative value against prejudicial impact before deciding whether to admit the testimony. *Ibn–Tamas*, 407 A.2d at 632. We repeatedly have stated that our scope of review of a trial court decision to admit or exclude expert testimony " 'is narrow, for the "trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." ' " *Id.* (quoting *Douglas v. United States*, 386 A.2d 289, 295 (D.C. 1978)).

This abuse of discretion standard of review is misleading in one respect, however, for it is addressed to the overall question of admissibility of a particular expert's testimony after all the criteria have been applied; it does not come to grips with the narrower question at issue here: our standard of review of the trial court's handling of the third *Dyas* criterion, *supra* note 4, which incorporates the *Frye* test. *See Ibn–Tamas*, 407 A.2d at 637. The question of general acceptance of a scientific technique, while referring to only one of the criteria for admissibility of expert testimony, in another sense transcends that particular inquiry, for, in attempting to establish such general acceptance for purposes of the case at hand, the proponent will also be asking the court to establish the law of the jurisdiction for future cases. General acceptance means just that; the answer can-

not vary from case to case. For this reason, when the third *Dyas* criterion—the *Frye* test—is at issue, it becomes the "threshold question" of admissibility, to be resolved as a matter of law before the court exercises its discretion in applying all the criteria to a particular proffered expert:

> The question of the reliability of a scientific technique or process is unlike the question, for example, of the helpfulness of particular expert testimony to the trier of facts in a specific case. The answer to the question about the reliability of a scientific technique or process does not vary according to the circumstances of each case. It is therefore inappropriate to view this threshold question of reliability as a matter within each trial judge's individual discretion.

*Reed v. State*, 283 Md. 374, 381, 391 A.2d 364, 367 (1978). But more succinctly, "courts should not subsume the question of qualifying the [scientific] process ... under the question of qualifying the expert." *People v. Law*, 40 Cal.App.3d 69, 75, 114 Cal.Rptr. 708, 711 (1974). It follows that, in evaluating whether a scientific technique has gained general acceptance, appellate courts review the trial court's analysis de novo. *See, e.g., id.; Reed*, 283 Md. at 399, 391 A.2d at 377; *Commonwealth v. Lykus*, 367 Mass. 191, 198, 327 N.E.2d 671, 675 (1975); *see also Addison*, 162 U.S.App.D.C. at 202–03, 498 F.2d at 744–45; *United States v. Brown*, 557 F.2d 541, 557 (6th Cir.1977); *see generally* Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half–Century Later*, 80 Colum.L.Rev. 1197, 1222–23 (1980); Case Comment, *Evidence: Admissibility of Spectrographic Voice Identification*, 56 Minn.L.Rev. 1235, 1245 (1972).

---

**4.** In *Dyas v. United States*, 376 A.2d 827 (D.C.), *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed. 2d 464 (1977), we premised admissibility of expert testimony on the following three criteria: (1) the subject matter "must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman"; (2) "the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth"; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert." *Id.* at 832 (quoting McCormick on Evidence § 13, at 29–31 (E. Cleary 2d ed. 1972)) (emphasis omitted).

De novo review in this context, however, is not self-explanatory. Does it simply mean review limited to the trial record, but without required deference to the trial court's findings and analysis? Or does it also permit appellate court reference to sources outside the record? If so, what kinds of sources: legal and scientific articles, as well as judicial decisions from other jurisdictions? If so, is one type of outside source entitled to greater weight than another? In any event, may the appellate court rely primarily or even exclusively on sources outside the record, or is the probative value of such sources limited to buttressing essential expert testimony of record?

The caselaw and other relevant literature do not definitively or consistently answer all these questions; nor do we purport to resolve them all here. But we do take an approach that addresses the concerns underlying these questions in a way that, we believe, appropriately resolves the present case.

(2)

We begin with *Wilson v. State,* 697 S.W. 2d 83 (Tex.App.1985). The appellate court reversed the trial court's revocation of probation based on the prohibited use of a controlled substance; the government had not established at trial the general scientific acceptance of the EMIT system, which had been used to detect the drug. *Id.* at 84. The court acknowledged that the witness who had administered the test, "a biological scientist," had testified that the Atlanta Center for Disease Control had found the test to be 97% to 99% accurate, but the court was concerned about his testimony on cross-examination that he could not "speak for all the scientific community." *Id.* The court concluded that the government accordingly had failed "to establish the scientific acceptance of its equipment and test results," stressing that "[t]here is no proof as to the EMIT system either being accepted or rejected anyplace else." *Id.* The court remanded the case to allow the government "to establish the scientific acceptance of the EMIT system." *Id.*

*Wilson* reflects the traditional approach to appellate review of a trial court's admission of a scientific test into evidence; there was a failure of proof at trial on the general acceptance issue, and thus the court reversed and remanded. But most appellate courts have taken a broader view of their review function. They have held that, in determining whether a particular technique or test has general acceptance in the relevant scientific community, the appellate court—like the trial court—may, and often should, pay attention not only to expert evidence of record but also to judicial opinions in other jurisdictions that have considered the question, as well as to relevant legal and scientific commentaries in which the technique or test has been scrutinized. *See, e.g. Lahey v. Kelly,* 71 N.Y.2d 135, 524 N.Y.S.2d 30, 34, 518 N.E.2d 924, 928–29 (1987) (relies exclusively on other judicial decisions to establish required general acceptance of EMIT system); *Reed,* 283 Md. at 399, 391 A.2d at 377 (relies on expert testimony, judicial decisions, and published articles in holding voiceprint technique does satisfy *Frye* test); *People v. Palmer,* 80 Cal.App.3d 239, 252, 145 Cal.Rptr. 466, 472 (1978) (relies exclusively on scientific journals to establish value and reliability of scanning electron microscope technique for gunshot evidence particle analysis); *Law,* 40 Cal.App.3d at 74–75, 114 Cal.Rptr. at 711–12 (relies on expert testimony, judicial decisions, and scientific journals in holding voiceprint technique does not meet *Frye* test); *see also Moore v. United States,* 374 A.2d 299, 301 n. 4 (D.C.1977) (considers scientific and legal articles in determining continued acceptance of Duquenois–Levine test for marijuana); *United States v. McDaniel,* 176 U.S.App.D.C. 60, 64–65, 538 F.2d 408, 412–13 (1976) (considers legal articles and judicial opinions regarding acceptance of voiceprint analysis); *United States v. Stifel,* 433 F.2d 431, 438–41 (6th Cir.1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971) (considers judicial opinions and scientific and legal articles showing general acceptance of neutron activation analysis); *cf. State v. Erickson,* 574 P.2d 1, 4–7 (Alaska 1978) (relies on expert testimony and scientific articles in

evaluating pharmacological properties of cocaine).

■■ There are two reasons why such judicial notice of court opinions and scientific literature is appropriate and, on occasion, even necessary. And these reasons are as relevant to trial court consideration of the issue as to appellate review de novo. First, reference to such outside sources may be useful in exposing a proffered expert's bias or incompetence. The expert, for example, may be the principal proponent of a controversial technique. For that reason, some courts have declined to permit a single expert to establish the required general acceptance. *See People v. Kelly*, 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976); *Commonwealth v. Topa*, 471 Pa. 223, 232, 369 A.2d 1277, 1282 (1977). And, at least one court has rejected the testimony of several experts in the same case on that ground. *People v. Tobey*, 401 Mich. 141, 146, 257 N.W.2d 537, 539 (1977). Under such circumstances, therefore, judicial opinions and legal and scientific books and articles have provided a sound basis—indeed the only basis—for rejecting proffered expert testimony. *Commonwealth v. Fatalo*, 346 Mass. 266, 268, 191 N.E.2d 479, 480 (1963) (appellate court relied on judicial opinions and published articles to sustain rejection of offer of proof by expert saying polygraph is 95% reliable).

Second, even absent a question of bias, because the court is addressing the question of general acceptance of a scientific technique, there is an obvious logic, if not imperative, in investigating how the larger body of courts and commentators have come out. The issue is consensus versus controversy over a particular technique, not its validity. Giannelli, 80 COLUM.L.REV. at 1217. Accordingly, because the focus is primarily on counting scientists' votes, rather than on verifying the soundness of a scientific conclusion, there will not be the concerns about witness credibility and hearsay normally associated with citations to empirical or scientific studies whose authors cannot be observed or cross-examined.[5]

The value of expert testimony, of course, is not to be underestimated, for it almost always supplies the court's basic understanding of a complex scientific issue and provides the opportunity for counsel and the court to pursue critical questions in the manner most helpful to resolving the case. Moreover, expert testimony can be helpful to update and critique some of the information available through published articles and judicial decisions that otherwise might undermine a claim of general acceptance in the scientific community. *See Lykus*, 367 Mass. at 201, 327 N.E.2d at 676–77. The point is, however, that judicial opinions and scientific articles, in addition to expert testimony of record, are useful if not essential in establishing general acceptance of a scientific technique.

---

5. Ten years ago, the Supreme Court of Alaska confronted the question whether classification of cocaine users as "narcotic" users under a criminal statute violated equal protection and due process. *State v. Erickson*, 574 P.2d 1, 4–7 (Alaska 1978). In doing so, the court had to determine the pharmacological properties and psychological impact of cocaine—an inquiry that pursued scientific truths, not merely the general acceptance of a particular scientific methodology. The court concluded that, because the answer required the court to find "legislative facts," in contrast with "adjudicative facts," the court properly could refer to scientific articles not considered by the trial court in addition to the expert testimony of record. The court noted that any "effort to present any substantial number" of the experts available, not to mention the authors of "literally hundreds of scientific articles," would be "prohibitively ex-

pensive and unduly time-consuming," and that it was "questionable whether such an expanded hearing would reveal more reliable or higher quality information" than that produced by the exchange of briefs plus "additional research at the appellate level." *Id.* at 6. The court added that, where the authors of scientific sources "have not been subjected to cross-examination, we will weigh their data and conclusions with this fact in mind." *Id.* at 7.

Although the distinction is not always sharp between determining whether there is general acceptance of a scientific proposition and whether that proposition is valid, we cite *Erickson* to note that even when that distinction is blurred there occasionally may be sound reason for an appellate court to rely on scientific sources, other than expert testimony of record, in resolving its scientific inquiry.

This conclusion, however, brings us only part way through our inquiry. In the present case, no expert testimony whatsoever was offered at trial regarding acceptance of the EMIT test in the relevant scientific community; thus, the question is whether this court can sustain the trial court's admission of EMIT test results by reference *exclusively* to extra-record sources of information.

(3)

Although the trial court accepted the prosecutor's proffer that Officer Jordan of the Drug Detection Unit had expertise as a technician in conducting the EMIT test and in reading the results, Jordan, in fact, was never formally recognized by the trial court as an expert of any sort. While it is clear from the record that Jordan had considerable knowledge regarding the practices and procedures of the Pretrial Service Agency's Drug Detection Unit, particularly with respect to the administration of EMIT drug tests, he was not presented as a scientist.[6] Thus, there is little in the record from which we may discern how the EMIT test is regarded among scientists in the field. The trial court, in ruling the EMIT results admissible, cryptically noted:

> This Court generally relies on it [the EMIT system] in doing a lot of things, like requiring treatment and testing and so forth. So I presume that [t]his Court would not be relying on something that you couldn't rely on.... [W]e are talking about a test which is apparently routine *and is sufficiently cemented to be employed in the manner we employ it at this time.* [Emphasis added.]

Although the trial court did not specifically refer to sources, the court, in ruling that EMIT "is apparently routine and is sufficiently cemented," was, in effect, judicially noticing that other Superior Court judges relied on EMIT, for the prosecutor herself had argued that the test results had become "cemented" and "accepted in the courthouse" by the rulings of three other trial judges. That is not much of a record,

if any, to sustain the general acceptance of EMIT. Were we to adopt the approach in *Wilson,* therefore, we would have to remand for development of the record on the *Frye* issue.

While this in many, perhaps most, cases may be the sensible and appropriate step, we believe it is unnecessary in this case. We deal here with what has become a thoroughly familiar issue in the nation as a whole. By applying the same sort of analysis that the trial court would have to use on remand, and recognizing the de novo standard of appellate review of any such analysis, we believe only one conclusion can be reached as to the general acceptance of EMIT in the relevant scientific community. We note, however, that in one respect our review of the issue necessarily is narrower than the trial court could require on remand, for we are not free to enhance the record with the help of live expert testimony. Thus, in reaching our conclusion we must consider whether this court, in reviewing the trial court's ruling, may altogether discount the absence of expert testimony or other evidence about EMIT and consult judicial opinions, as well as legal and scientific literature, as the *exclusive* basis for establishing the general acceptance of EMIT in the relevant scientific community as a matter of law.

 At least one appellate court has used a collection of scientific articles, revealing a genuine dispute about a scientific technique as the only basis for rejecting proffered expert testimony, *see Fatalo,* 346 Mass. at 268, 191 N.E.2d at 480; Giannelli, 80 Colum.L.Rev. at 1218. Another appellate court has taken a more radical step, basing general acceptance of a scientific technique exclusively on published articles. *Palmer,* 80 Cal.App.3d at 254, 145 Cal. Rptr. at 473 (scientific journals alone establish value and reliability of the scanning electron microscope technique for gunshot residue particle analysis). Judicial notice of publications to establish general accept-

---

**6.** Jordan testified that he was familiar with studies conducted by the Center for Disease Control in Atlanta, Georgia showing for EMIT "a 98 percent effective rate in testing of cocaine,

97 percent effective as to heroin, PCP and methadone." He could not testify as to the scientific basis for the studies, however, nor was he familiar with any other study on the subject.

ance, as in *Palmer*, is more problematic, than using such studies to reject proffered testimony, as in *Fatalo*. *See* Giannelli, 80 COLUM.L.REV. at 1217. If the court finds articles tending to establish general acceptance, there will still be a risk that, despite help from the parties, the court may have failed to find relevant articles to the contrary, especially those in more obscure technical and scientific journals, rather than in law reviews. *Id.* If the court finds articles on both sides of the issue, however, there will probably be little risk (absent powerful expert testimony proffered by the proponent of the scientific technique) that the court would be wrong in concluding the technique had not received general acceptance.

Perhaps because reliance on articles to establish general acceptance is problematic, more appellate courts, confronted by trial court rulings not based on expert testimony, have been willing instead to sustain the rulings primarily on the basis of judicial notice of other court opinions which themselves were based in substantial part on expert testimony. A number of appellate courts have altogether dispensed with the need for expert testimony at trial if (1) other courts have established, from expert testimony and other sources, the general scientific acceptance of the particular test at issue, and (2) the records and judicial elaborations of these other cases are sufficiently complete and persuasive that the appellate court confidently can incorporate the work of the other courts by reference. This approach has been commonly used in evaluating the EMIT system. *See, e.g., Spence*, 807 F.2d at 756 (reliance on other judicial decisions to establish general acceptance of double EMIT test); *Lahey*, 524 N.Y.S.2d at 34, 518 N.E.2d at 929 (legal writings and judicial opinions sufficient, without expert testimony of record, to show general acceptance of EMIT); *Vasquez v. Coughlin*, 118 A.D.2d 897, 898, 499 N.Y.S.2d 461, 462 (1986) (reliance on other judicial decisions to establish EMIT); *Walker*, 164 Ill.App.3d at 135–37, 115 Ill. Dec. at 269–70, 517 N.E.2d at 680–81 (reliance on other judicial decisions to establish general acceptance of double EMIT

test). Expert testimony in other cases, subject to cross-examination, can be probative of general acceptance of a scientific technique; thus, judicial notice of it is appropriate. *See Kelly*, 17 Cal.3d at 34, 130 Cal.Rptr. at 159, 549 P.2d at 1247; *Lykus*, 367 Mass. at 199–200 n. 3, 327 N.E.2d at 676 n. 3; *Topa*, 471 Pa. at 230 n. 2, 369 A.2d at 1281 n. 2; Giannelli, 80 COLUM.L. REV. at 1218. The reviewing court, of course, has to take care that judicial notice of other court opinions is limited to comprehensive expert testimony on the general acceptance issue; otherwise, there is a danger that reliance on other judicial opinions could, in effect, amount to delegation of decision-making to another court which itself ruled on the basis of an inadequate record. *See* Giannelli, 80 COLUM.L.REV. at 1218–19.

In two recent New York cases we see this process of judicial notice at work. In *Peranzo v. Coughlin*, 675 F.Supp. 102 (S.D.N.Y.1987), *aff'd*, 850 F.2d 125 (2d Cir. 1988) the federal district court for the southern district of New York evaluated whether the EMIT test is sufficiently reliable as evidence in prison disciplinary and parole hearings to satisfy due process. The court considered, in particular, the test data and results from a study by the New York Department of Correctional Services (DOCS) under the auspices of the American Association of Bioanalysts demonstrating an accuracy rate of from 98.7% to 99.7% in administration of double EMIT tests. The court concluded:

> We now find that, with a 98+% rate of accuracy, the double EMIT testing as performed by DOCS is sufficiently reliable so that the use of the results as evidence, even as the only evidence, in a disciplinary hearing does not offend due process. We further find that the introduction of the results as an element to be considered in parole decisions does not offend due process.

*Id.* at 105.

Subsequently, in *Lahey*, the New York Court of Appeals also concluded, citing *Peranzo*, that the EMIT test is sufficiently reliable to provide substantial evidence that

inmates violated prison rules prohibiting the use of controlled substances. *Lahey,* 524 N.Y.S.2d at 34, 518 N.E.2d at 928. In In *Lahey,* however, as in the present case, the government did not specifically prove the general acceptance and reliability of the test, through expert testimony or otherwise, at trial. The appellate court, instead, went altogether outside the record, noting that "[n]either expert testimony nor detailed findings by the scientific community are essential before scientific tests or procedures are recognized. . . . The court may find scientific tests reliable based on the general acceptance of the procedures as shown through legal writings and judicial opinions." *Id.* (citations omitted). The court in *Lahey* relied primarily on the elaborations of the DOCS study in *Peranzo* but also noted that "the overwhelming majority of State and Federal courts which have considered the reliability of the EMIT drug test results" had found them reliable. *Lahey,* 524 N.Y.S.2d at 33, 518 N.E.2d at 928 (citing *Spence,* 807 F.2d at 756 (EMIT test, with confirmatory second EMIT or other test, contains sufficient indicia of reliability to provide evidence of drug use); *Harmon v. Auger,* 768 F.2d 270, 276 (8th Cir.1985) (EMIT test results are "about 95% accurate" and form sufficient basis for disciplinary action); *Wykoff,* 613 F.Supp. at 1512 (positive EMIT test confirmed by second EMIT test or its equivalent satisfies due process); *Jensen v. Lick,* 589 F.Supp. 35 (D.N.D.1984) (unconfirmed EMIT test results satisfy due process)). The court also noted that most of the cases in which lower courts had determined that EMIT tests were unreliable involved single, unconfirmed tests. *Lahey,* 524 N.Y.S.2d at 33, 518 N.E.2d at 928 (factually distinguishing *Higgs v. Wilson,* 616 F.Supp. 226 (W.D.Ky. 1985), *vacated sub nom. Higgs v. Bland,* 793 F.2d 1291 (6th Cir.1986); *Wilson, supra; Kane v. Fair,* 33 Crim.L.Rptr. 2492 (Mass.Super.Ct.1983)).

In the present case, we confront a situation similar to the one addressed in *Lahey.*

We do not have a useful trial record, but we do have available a cogent opinion on the same issue from within our own jurisdiction. The thoughtful, comprehensive opinion by Judge Burgess of the Superior Court in *United States v. Roy,* 113 Daily Wash.L.Rptr. 2317 (Nov. 15, 1985), was issued just two months after appellant's trial. In that case, as here, the court confronted the question whether double EMIT test results obtained by the Pretrial Services Agency—*i.e.,* two positive results obtained from the same urine sample—were sufficiently reliable for admission into evidence.[7] The defendant in *Roy* allegedly had violated conditions of his pretrial release by ingesting PCP. The government's evidence consisted solely of a series of positive EMIT drug test results reported in the Agency's records. The government presented the expert testimony of Robert M. Murphy, a technical service representative for the Syva Company, which had developed the EMIT drug testing technology and now manufactures, sells, and installs EMIT drug testing equipment and trains technicians to use it. The court accepted Murphy as an expert in pharmokinetics, " 'the study of bodily absorption, distribution, metabolism, and excretion of drugs.' " *Id.* at 2319 & n. 2 (quoting from WEBSTER'S NEW COLLEGIATE DICTIONARY (1979)). Murphy's testimony with respect to the scientific bases of the EMIT system and how it works is summarized at length in Judge Burgess's opinion. *Id.* at 2319–20. Murphy testified that Syva Company tests had shown the EMIT system to be 98% accurate, with a bias toward false negative rather than false positive results. He also testified that EMIT testing had been in use since 1981 or 1982. Within the territory for which he was responsible, encompassing Maryland, Virginia, Delaware, and the District of Columbia, Murphy testified that EMIT was used in approximately sixty hospitals for purposes of drug treatment, emergency room diagnosis, and the monitoring of certain drugs. The system, ac-

---

7. In the present case, Jordan testified that, pursuant to the routine practice of the Pretrial Services Agency, appellant's urine had been tested a second time when the first test rendered a positive result. The second test was also positive. We need not decide, therefore, whether a single positive EMIT result meets the requisite standard.

cording to Murphy, was also used at the National Institutes of Health and in private industry, the military, and various law enforcement agencies. *Id.* at 2320.

In addition to reviewing Murphy's testimony, Judge Burgess conducted his own survey of the scientific literature on EMIT testing. *See id.* at 2321 n. 3. Although Judge Burgess concluded that Murphy's testimony alone established that the technique had gained general acceptance in the scientific community, the judge found that the literature buttressed that conclusion. *Id.* at 2320–21. Specifically, he found that "[t]he literature shows a uniform acceptance of the enzyme immunoassay technique in general and of the EMIT system in particular." *Id.* at 2321. Judge Burgess concluded: "The enzyme immunoassay technique and the EMIT system are sufficiently reliable and accepted in the scientific community to be admissible in a trial." *Id.*[8]

 Based on the record in *Roy* and on Judge Burgess's persuasive opinion, as well as on the numerous cases from other jurisdictions that have also found the EMIT test reliable, *see, e.g., Spence,* 807 F.2d at 756–57; *Peranzo,* 675 F.Supp. at 105; *Jensen,* 589 F.Supp. at 39; *Walker,* 164 Ill. App.3d at 137, 115 Ill.Dec. at 270, 517 N.E.2d at 681; *Lahey,* 524 N.Y.S.2d at 34, 518 N.E.2d at 928; *Vasquez,* 118 A.D.2d at 898, 499 N.Y.S.2d at 462 we have no difficulty ruling that the EMIT system has reached the level of general acceptance in the scientific community required by *Frye,* 54 App.D.C. at 47, 293 F. at 1014. We therefore rely primarily on a trial court decision from our own jurisdiction, based on expert scientific evidence in a record with which we are familiar and in which we have confidence because of the thoroughness with which counsel tried the case and the judge evaluated the evidence. We rely secondarily on, and thus confirm our judgment by reference to, judicial opinions from other jurisdictions which have reached the same result. We conclude that EMIT test results are presumptively reliable and thus generally admissible into evidence in every case.[9] (Parenthetically, we emphasize that we do not rely, additionally, on an independent review of scientific or legal literature discussing EMIT. We prefer to rely on judicial decisions which themselves have a trial record—or judicially notice a trial record—that reflects expert testimony, subject to cross-examination, about EMIT. Thus, we need not consider the question whether an appellate court may conclude that *Frye* is satisfied *exclusively* by reference to scientific and legal literature, absent relevant expert testimony of record that can be readily incorporated for purposes of the case.)

### (4)

 We discern no evidence in this case that would override the presumption of re-

---

**8.** Judge Burgess later distinguished between the general admissibility of the evidence and the weight it may be given in a particular case. Although Judge Burgess determined, in *Roy,* that the EMIT system had gained general acceptance in the scientific community and could thus be deemed sufficiently reliable for admission into evidence, the judge, in a subsequent opinion, found that the test results, although admissible, lacked sufficient weight to sustain a conviction on the contempt charge at issue. *United States v. Roy,* 114 Daily Wash.L.Rptr. 2481 (Dec. 1, 1986) (*Roy II*). In *Roy II,* Judge Burgess reaffirmed his earlier ruling that "the EMIT system is generally accepted among scientists and is sufficiently reliable to permit use of the results as legal evidence." *Id.* at 2489. The judge held, however, that in the absence of expert testimony regarding the length of time PCP remains in the body in detectable amounts, the positive EMIT test results, taken alone,

could not establish that the defendant had ingested PCP during the period of time in which he was prohibited by court order from doing so. Consequently, Judge Burgess concluded, the government's evidence was insufficient to show guilt beyond a reasonable doubt. *Id.* at 2491.

**9.** One court has observed that, "once a trial court has admitted evidence based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community." *People v. Kelly,* 17 Cal.3d 24, 32, 130 Cal.Rptr. 144, 149, 549 P.2d 1240, 1245 (1976). Appellant has proffered no evidence, at trial or on appeal, that would question the general acceptance of EMIT in the scientific community since *Lahey* (1987), *Roy II* (1986), and *Roy I* (1985).

liability and militate against admission of appellant's EMIT test results. There is nothing in the record to indicate that the Pretrial Service Agency's drug testing program does not conform with accepted standards. Jordan testified that he had helped draft the Agency's drug testing guidelines and was familiar with the standard procedures. He testified that EMIT testing machines are calibrated each morning with known samples of urine provided by the manufacturer and that all samples are tested twice. On cross-examination, Jordan testified that the Agency's drug testing operation is monitored quarterly by the American Association of Bioanalysis, which sends samples of unknown substances for the Agency to test and then evaluates the Agency's test results. According to Jordan, the Pretrail Service Agency has received from the Association "a 100 percent effective rate." Thus, we conclude that the EMIT test results were properly admitted in this case.

■ Appellant contends that evidence of his prior drug use, even if sufficiently reliable, should have been excluded on the ground that it was more prejudicial than probative. Because defense counsel did not raise this objection at trial, we may reverse only if we conclude that the error, if any, rose to the level of plain error, that is, error so clearly prejudicial to substantial rights of the defendant as to jeopardize the very fairness and integrity of the trial. *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc).

■ There was no plain error here.[10] Jordan testified as to the accuracy of the drug testing device used by the Pretrial Services Agency, admitting that the test is subject to a two percent margin of error. Thus, the jury was free to conclude that appellant had testified truthfully and had

merely been subject to an inaccurate test result. On the other hand, the test results were clearly probative of whether or not appellant had some prior experience with drugs. The weighing of probativeness against prejudice is committed to the sound discretion of the trial court. *Hawkins*, 482 A.2d at 1232. We see no basis, on the record before us, to disturb the trial court's admission of the evidence at issue.

### C.

■ We also conclude that appellant's sixth amendment confrontation right in no way was abridged. Having concluded that the EMIT test results are presumptively reliable and thus properly admissible into evidence, and that the Agency's record reporting the test result falls within the business records exception to the hearsay rule, *supra* note 3, we believe it is immaterial that neither a scientific expert on the EMIT system nor the technician who actually conducted the test was presented at trial. As we stated in *Howard v. United States*, 473 A.2d 835 (D.C.1984),

> [d]espite the importance of confrontation and the basic rule against admission of hearsay testimony, it is, of course, well established that certain types of hearsay evidence are inherently reliable and therefore admissible as exceptions to the requirements of the Confrontation Clause....
>
> The business and public records hearsay exceptions are among the exceptions that "rest upon such solid foundations that admission of virtually any evidence within them comports with the 'substance of the constitutional protection.' "

473 A.2d at 838 (quoting *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980) (quoting *Mattox v. United States*, 156 U.S. 237, 244, 15 S.Ct. 337,

---

10. We also reject appellant's argument that the evidence of his prior cocaine use constituted inadmissible evidence of "other crimes." Although "other crimes" evidence is inadmissible to show a propensity to commit the crime at issue, it may be admitted "in impeachment (where the defendant takes the stand), to prove a necessary element of the crime being tried, or to prove other circumstances relevant to issues

raised during the course of the trial...." *Sellman v. United States*, 386 A.2d 303, 307 (D.C. 1978); *see United States v. Bell*, 165 U.S.App.D.C. 146, 506 F.2d 207 (1974) (other crimes evidence may be admissible to impeach the accused). The evidence of appellant's prior cocaine use was properly admitted to impeach his statement that he had never used the drug in the past.

340, 39 L.Ed. 409 (1895))). As with the chemists' reports at issue in *Howard,* the drug test reports at issue here contain objective data merely recorded by the technician. The contents of the report itself are open to little dispute. Appellant remains free, of course, to "inquir[e] into the reliability of the testing procedure or the qualifications of the [technicians]." *Id.* at 839. Indeed, appellant did both in this case. "The courts have emphasized that the Confrontation Clause does not require barring the admission of reports that contain objective facts and that are made in the regular course of business by persons without any apparent bias." *Id.* at 840. We thus have no difficulty holding that the admission of the Pretrial Services Agency drug test report in this case was proper and did not constitute a violation of appellant's confrontation right.

### IV.

■ Appellant contends, finally, that the evidence adduced was insufficient to show that he possessed the drugs with intent to distribute. Again, his contention lacks merit. In reviewing a case for sufficiency of the evidence, we are obliged to view the evidence in the light most favorable to the government, *Patterson v. United States,* 479 A.2d 335, 337–38 (D.C.1984), and must consider the jury's right to weigh the evidence, draw all reasonable inferences from the facts, and determine the credibility of the witnesses, *Langley v. United States,* 515 A.2d 729, 731 (D.C.1986). Here, the government's evidence shows that appellant was apprehended near a government building, at lunchtime, in possession of a quantity of drugs typically larger than usual for personal use, packaged as so-called "executive hits" which are frequently sold to government workers on lunch break. Moreover, appellant's defense that he merely had found the packets and did not know what they contained was impeached by Jordan's testimony that appellant tested positive for cocaine use the next day. The evidence was thus clearly sufficient for a reasonable jury to find beyond a reasonable doubt that appellant possessed the drugs, not for personal use but with intent to sell them. *Frendak v. United States,* 408 A.2d 364, 370–71 (D.C.1979).

AFFIRMED.